**COMMERCIAL NATIONAL BANK as Administrator of the Estate of Claude V. Raines, III, deceased, Appellee,**

v.

**MISSOURI PACIFIC RAILROAD, Appellant.**

No. 79–1989.

United States Court of Appeals, Eighth Circuit.

Submitted May 21, 1980.
Decided Sept. 10, 1980.

Donald H. Bacon, Friday, Eldredge & Clark, Little Rock, Ark. (argued), and William A. Eldredge, Jr., Little Rock, Ark., on brief, for appellant.

Sandy S. McMath, Little Rock, Ark. (argued), and McMath, Leatherman & Woods, Little Rock, Ark., on brief, for appellee.

Before GIBSON, Senior Circuit Judge, and HEANEY and HENLEY, Circuit Judges.

HEANEY, Circuit Judge.

Eight–year–old Claude Raines, III, was run over and killed by a railroad car on the tracks of the Missouri Pacific Railroad on March 1, 1974. Claude's father then commenced this diversity action against the Missouri Pacific on behalf of Claude's family and his estate. After trial, the jury returned a verdict in favor of the Railroad. The trial court[1] subsequently set aside the initial judgment and granted a new trial. The second trial resulted in a jury verdict of $61,025.15 in favor of the plaintiff. The Railroad's motion for judgment notwithstanding the verdict was denied by the trial court. We affirm.

On the afternoon of March 1, 1974, Claude Raines was playing with friends in a neighbor's yard, a half block from his home in Wynne, Arkansas. Since Claude and his friend, John Taylor, were teasing the neighborhood girls with water pistols, they were told by John's parents to leave the girls

---

1. The United States District Court for the Eastern District of Arkansas, Judge G. Thomas Eisele presiding.

alone and to go play in the backyard. Ten or fifteen minutes later, Claude was run over and killed by a railroad car on the switching tracks of the Missouri Pacific Railroad, a little over a block from his home.

Because no one witnessed the accident, the exact circumstances of Claude's death are unknown. It is known, however, that the tracks were being used that afternoon for assembling a train and that Claude was killed during this process.

On this appeal, the Missouri Pacific contends that it was an abuse of discretion to vacate the first verdict and that several errors were made in submitting the case to the second jury.

## I

### GRANTING A NEW TRIAL

■ The grant or denial of a new trial is within the discretion of the trial court and should be upheld unless that discretion has been abused. *Farmers Co-op. Elevator Ass'n Non-Stock v. Strand*, 382 F.2d 224, 230–231 (8th Cir.), *cert. denied*, 389 U.S. 1014, 88 S.Ct. 589, 19 L.Ed.2d 659 (1967). *See also Dickerson Const. Co., Inc. v. Dozier*, 584 S.W.2d 36, 42 (Ark.1979) ("[The trial court's] discretion will not be reversed in the absence of manifest abuse.").

Here, the trial court found that "substantial justice will best be served by a new trial" and cited, as reasons for its rulings, its failure to partially direct the verdict on the negligence issue, the diversion of the trial to irrelevant issues, the improper and highly prejudicial cross-examination of Claude's father, and an improper line of questioning used by defense counsel. The Missouri Pacific contends on this appeal that the trial court's grant of a new trial was an abuse of discretion because several of the reasons given by the trial court reflect errors of law.

Since the trial court's discretionary grant is adequately supported by some of its stated reasons, we need not decide whether each and every reason cited by the trial court supports the granting of a new trial. It is sufficient that we have examined all the reasons and the record as a whole and find no abuse.[2]

One reason supporting the trial court's decision to grant a new trial was that the issue of contributory parental negligence was mishandled at the first trial. The facts are clear that Mrs. Raines was working away from home on March 1, 1974. Mr. Raines, who was looking for work, had been away from home during the day but returned in the afternoon because Claude was then out of school and at home. Claude returned from school and was soon playing with a neighbor, John Taylor, in the Taylor's yard. Claude often played at the Taylor home and there was an informal arrangement for Mrs. Taylor to take care of the Raines' children when Mr. and Mrs. Raines were not around. Mr. Raines left home later that afternoon for about half an hour to place another call about a job. It was while Mr. Raines was away making this call that the accident was discovered. There is no evidence that Mr. and Mrs. Raines specifically warned Claude not to play on the tracks or that they were aware that he had played there in the past.

■ We agree with the district court that these facts were insufficient to warrant putting the issue of the parents' negligence before the jury. This issue, like all others, need not go to the jury unless the record, when viewed in the light most favorable to the Railroad, contains some evidence from which a jury could conclude that the Raines were negligent. *See Blythe v. Byrd*, 251 Ark. 363, 472 S.W.2d 717, 720

2. One of the reasons given for granting a new trial was that the Railroad, in attempting to impeach Claude's father's credibility at the first trial, improperly strayed into a recitation of Mr. Raines' prior criminal record. At the second trial, the district court prohibited this line of inquiry and the Railroad contends that this was error. It is apparent that the only issue on which Mr. Raines' credibility was in doubt was itself irrelevant to the lawsuit. Consequently, his impeachment, which would be highly prejudicial, would also be of little relevance. We think that it was properly excluded under Rule 403 of the Federal Rules of Evidence.

(1971); *Paul Hardeman, Inc. v. J. I. Hass Co.*, 246 Ark. 559, 439 S.W.2d 281, 283 (1969). No negligence can be found in letting Claude go to the Taylor's yard, a half block away from home, to play with his friend. Mr. Raines knew that the adult Taylors were home and that Claude often played there. As Dean Prosser said, "[w]hile it is true that his parents or guardi-'ans are charged with the duty of looking out for [a child], it is obviously neither customary nor practicable for them to follow him around with a keeper, or chain him to the bedpost." W. Prosser, Law of Torts § 59 at 364 (4th ed. 1971). Here, even when the evidence is viewed in the light most favorable to the Railroad, there is nothing tending to establish that the duty of looking out for the child was breached by his parents.

At the first trial, however, the defense counsel injected the parental negligence issue into his closing argument and the trial court gave no curative instruction. The trial court's later decision that the jury should have been instructed that no issue of parental negligence existed was proper. At the second trial, the court gave such an instruction.

Additional support for the decision to grant a new trial can be found in defense counsel's examination of the railroad conductor. Through his questioning, counsel for the Railroad attempted to suggest that Claude's father was trying to shift the blame for his son's death away from himself and on to the shoulders of the conductor. Counsel made this "attempt" appear unseemly by suggesting that the conductor had suffered enough already, having lost two sons of his own in tragic deaths. Since, by the thrust of his examination, counsel sought to elicit evidence that was of little or no relevance and was unfairly prejudicial, *see* Fed.R.Evid. 403, the district court could conclude, as it did, that the examination had made the first trial less than adequately fair. For this reason, as well as for the problem presented in the treatment of the parental negligence issue, we conclude that the district court's grant of a new trial was not an abuse of discretion.

## II

### THE SECOND TRIAL

The Railroad's primary contention regarding the second trial is that the court erred in submitting the issues of negligent lookout and proximate cause to the jury, since there was insufficient evidence to sustain findings of either. A brief survey of the facts is necessary to understand this contention.

On the afternoon that Claude was killed, four railroad employees were assembling a train in the Wynne railroad yard. Of the four men assigned to this task, one drove the locomotive, one ran the switches, one pulled the pin that uncoupled the cars and one rode the first cut of cars down each track, set the brakes and then walked back up to the train. Subsequent cuts were sent down the tracks unattended. The testimony of the first three men was that they each maintained a lookout in their area of operation but that none of them were in a position to see the general area in which Claude was killed. The fourth man, Mr. Galbreath, testified that he rode on the back of the first cut of cars sent down that track. He set the brakes on the end car and then walked back up toward the switches. As he walked, a second cut of cars came toward him, passed him and he turned and watched them couple with the first set on the track. A third cut of cars was also sent down this track but by the time these cars rolled by Mr. Galbreath, he was no longer in a position to see down the track or to watch the area of impact since he had moved up toward where the other men were working.

By statute, the Railroad has a duty to "keep a constant lookout for all persons, including * * * trespassers" on its tracks. Its failure to do so constitutes negligence. Ark.Stat.Ann. § 73–1002. The Railroad contends, however, that the plaintiff failed to prove either that a constant lookout was not kept or that the lack of a lookout was the proximate cause of Claude's death.

In support of its position, the Railroad cites *St. Louis–San Fran. Ry. v. Sheppard*, 194 Ark. 619, 109 S.W.2d 109 (1937). In that case, two refrigerator cars stood idle on a set of tracks alongside a mill in which Mr. Sheppard worked. On the morning in question, Mr. Sheppard climbed out of a basement window into the narrow space between the mill and the refrigerator cars and then began to crawl under them. Unfortunately, as he did so, the refrigerator cars were struck by three freight cars which had just been kicked off the main line. As the refrigerator cars recoiled from the impact, Mr. Sheppard was killed underneath their wheels. Although there were no obstructions on the track between the place where the cars were kicked to the site of impact, the railroad crew could not see behind the refrigerator cars to the window from which Sheppard emerged. On these facts, the Arkansas Supreme Court was "unable to find any substantial evidence * * * that the dangerous position occupied by George Sheppard might have been discovered and his injury and death avoided if an efficient lookout had been kept * * *." 109 S.W.2d at 110.

■ We think the circumstances of Claude's death are far different than those of Sheppard's. Claude entered onto the tracks by crossing a street and then an open ditch. Access to the railroad through the ditch had been made easier by the placement of old railroad ties and boxcar doors, and the Railroad knew that people approached and crossed their tracks in this area. Had someone from the Railroad been maintaining a lookout down this track, Claude's approach may well have been detected, and either Claude could have been warned or the switching process halted until Claude was removed. Whether the lookout maintained by the Railroad was sufficient was a question properly before the jury, and we think that the evidence was sufficient for them to conclude both that the Railroad was negligent and that such negligence was the proximate cause of Claude's death.

The Railroad also contends that the trial court erred in submitting the case to the jury on an attractive nuisance theory. Under this theory, the trial court instructed the jury that the plaintiff had the burden of proving the following propositions:

First, that a condition existed upon the Missouri Pacific Railroad Company's premises which it knew or reasonably should have known involved a reasonably foreseeable risk of harm to children;

Second, that it knew or reasonably should have foreseen that children would likely be attracted to the area of danger;

Third, that the expense or inconvenience to the Missouri Pacific Railroad in remedying the condition would be slight in comparison to the risk of harm to children;

And, fourth, that the condition was a proximate cause of the death of Claude Raines, III.

In arguing that this was an erroneous submission, the Railroad relies primarily upon the 1893 case of *Catlett v. St. Louis, I. M. & S. Ry.*, 57 Ark. 461, 21 S.W. 1062 (1893). *See also Sams v. Pacific Indem. Co.*, 170 F.Supp. 909, 915–916 (D.Ark.), *appeal dismissed*, 271 F.2d 126 (8th Cir. 1959) (discussing *Catlett*). There, the Court rejected application of the "turntable doctrine," as the attractive nuisance doctrine is sometimes called, to protect an eleven–year–old boy injured while attempting to board a slow moving freight train. The boy had been repeatedly warned by his parents of the danger of his boarding these trains and the risk he ran was clearly apparent, even to the youth. Contrary to the argument of the Railroad, the *Catlett* case does not, either by its terms or in its application, stand for the proposition that "a railroad train is not an attractive nuisance" under Arkansas law. Arkansas adheres to the attractive nuisance doctrine, *Carmichael v. Little Rock Housing Auth.*, 227 Ark. 470, 299 S.W.2d 198, 199 (1957), and there appears to be no reason for concluding that trains, when they present the special conditions required for application of the doctrine, are not covered.

Here, the evidence was sufficient to allow the attractive nuisance theory to go to the jury. There was ample evidence that the Railroad knew that children crossed the tracks with some regularity and played in the railroad yard. It also knew of the special dangers presented by the switching process. Further, there was sufficient evidence for the jury to conclude that the expense or inconvenience to the Railroad in remedying the condition by posting a special lookout for its switching operation was slight in comparison to the risk of harm to the children who crossed or played on its tracks.

The Railroad's final contention regarding the second trial is that it was error not to submit the issue of contributory parental negligence to the jury. For the reasons given in Section I of this opinion, this argument is without merit.

The district court is affirmed.